**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| WILLIAM THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | |
| | ) | |
| BOOKING.COM B.V.; BOOKING.COM | ) | CLASS ACTION |
| (USA), INC.; EXPEDIA, INC.; | ) | |
| HOTELS.COM LP; ORBITZ | ) | JURY TRIAL DEMANDED |
| WORLDWIDE, INC.;  PRICELINE.COM | ) | |
| INCORPORATED; SABRE HOLDINGS | ) | |
| CORPORATION; TRAVELOCITY.COM | ) | |
| LP; HILTON WORLDWIDE, INC.; | ) | |
| INTERCONTINENTAL HOTELS | ) | |
| GROUP RESOURCES, INC.; KIMPTON | ) | |
| HOTEL & RESTAURANT GROUP, LLC; | ) | |
| MARRIOTT INTERNATIONAL, INC.; | ) | |
| STARWOOD HOTELS & RESORTS | ) | |
| WORLDWIDE INC.; TRUMP | ) | |
| INTERNATIONAL HOTELS | ) | |
| MANAGEMENT, LLC; and, JANE DOES | ) | |
| 1-100, | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff William Thompson, by and through his attorneys, on behalf of himself and all

others similarly situated, brings this Class Action Complaint against Booking.com B.V.,

Booking.com (USA), Inc. ("Booking.com"), Expedia, Inc. ("Expedia"), Hotels.com LP

("Hotels.com"), Orbitz Worldwide, Inc. ("Orbitz"), Priceline.com, Inc. ("Priceline"), Sabre

Holdings Corporation ("Sabre Holdings"), and Travelocity.com LP ("Travelocity"),

(collectively, "the Online Travel Company Defendants" hereinafter "OTCs" or "OTC Defendants") and Hilton Worldwide, Inc. ("Hilton"); InterContinental Hotels Group Resources Inc. ("InterContinental"), Kimpton Hotel & Restaurant Group, LLC ("Kimpton"), Marriott International, Inc. ("Marriott"); Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"), and Trump International Hotels Management, LLC, ("Trump"), (collectively, "Hotel Defendants") and alleges, based upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation of counsel and upon information and belief, as follows:

## NATURE OF CLAIM

1.      During the class period Plaintiff William Thompson, purchased reservations for the occupancy of hotel rooms directly from one or more of the OTC Defendants in the United States including, but not limited to, Priceline.com. Plaintiff brings this direct purchaser antitrust and consumer class action to remedy the OTC Defendants' conspiracy with the Hotel Defendants to enter into, fix, raise, stabilize, maintain and/or enforce minimum price maintenance agreements ("Price Maintenance Agreements" or "PMA's") and also to remedy the *per se* horizontal conspiracy entered into by the OTC Defendants. As a direct and proximate result of Defendants acts, which are continuing, Plaintiff seeks damages and equitable relief from Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26, and the Massachusetts Consumer Protection Statute, M.G.L.C. 93A, and other applicable consumer protection statutes.

2.      The OTC Defendants, along with the Hotel Defendants, control the market for room reservations in the Commonwealth of Massachusetts and throughout the United States. The OTC Defendants conspired with the Hotel Defendants and unlawfully agreed to enter into a

scheme to impose a uniform price and rack rate structure pursuant to which they fixed and maintained the price to occupants for hotel rooms based upon a coordinated fixed structure which artificially set the price for retail room reservations and maintained rate parity on the rate of the room itself (hereinafter "Rack Rates" or "Rack-Rate Structure").

3.      The Defendants agreed to restrict and restrain competition for the price of hotel rooms pursuant to Defendants' uniform scheme which artificially increased the prices charged for hotel rooms nationwide. Throughout the class period, Defendants have used OTC-Hotel Agreements to set, fix, and maintain minimum prices at the Rack Rates. The PMA Agreements between the Online Travel Companies and Hotel Defendants provide *inter alia*, that comparable room reservations will not be sold to Plaintiff and members of the Class for less than the Rack Rate agreed upon by the Defendants.

4.      The PMA Agreements between the Defendants restrain price competition for hotel room rates by requiring the Hotel Defendants to set and also participate in the enforcement of minimum price maintenance agreements and to prevent attempted price-cutting by competing OTC Defendants, and/or to prevent price-cutting and discounting of room rates. In effect, the OTC-Hotel conspiracy prevents the Defendants or any related party from engaging in conduct which would result in the profit-lowering effects of the agreed upon rack rates or rack rate structure.

5.      Pursuant to the Defendants' RPM Agreements, the Hotel Defendants agreed to and have in fact enforced the price maintenance agreements such that any OTC who competed or attempted to compete with the named OTC Defendants with respect to price would be effectively barred from selling the Defendant Hotel rooms.  Further, all Defendants were part

of an anti-competitive scheme, pursuant to which the OTC Defendants were allowed to exercise their substantial market power and dominance to unlawfully conspire with the other online travel companies and impose and implement minimum resale price maintenance agreements; enforce the Agreements; refuse to supply or cut off supply to competing price-cutting OTCs; and otherwise engage in the other anticompetitive conduct specified herein; all in violation of Section 1 of the Sherman Act, Sections 4 and 16 of the Clayton Act and Massachusetts law.

6.      Each of the Defendants has conspired and colluded by engaging in unlawful measures to ensure that the room rates will be the same or constant for the same product in all online distribution channels.  The Hotel Defendants set a price point and created a base floor below which any of the Defendants could not sell hotel rooms. Further, the OTCs use "rate parity" specialists to ensure that all Participants are abiding by the agreements.

7.      As a result of the concerted scheme designated and implemented by the Defendants, hotel room reservations were not to be sold to Plaintiff and members of the Class for less than the Rack Rate or based upon free and open competition. The OTC Defendants, agreed not to compete with the complicit agreement of the Hotel Defendants, not to compete on the basis of price, and accordingly, the retail rates for hotel room reservations were set at the Rack Rates.  The Agreements are the product of a centralized conspiracy resulting in Plaintiff and Class members paying artificially inflated prices for hotel rooms.

8.      The OTC Defendants each have similar clauses in their contracts, and none of the OTC Defendants compete with any of the other OTC Defendants on price. As a result of this concerted PMA scheme entered into by the OTC and Hotel Defendants, room reservations are

not being sold to Plaintiff and members of the Class for less than the Rack Rate. Accordingly, the retail rates for room reservations are set at Rack Rates pursuant to the Rack Rate Structure and thus are virtually identical amongst the OTC Defendants and the Hotel Defendants.

9.      Moreover, since the OTC Defendants' agreed not to compete on price, their advertised "best price guarantees" are nothing more than an illusion for their conspiracy to fix prices, such that the OTC Defendants do not compete on price but can deceptively offer a so-called "best price" guarantee to their customers knowing that all of the OTC Defendants will offer the *same* anti-competitive fixed price. Accordingly, in reality, there is no "best price" but instead there is fixed artificially inflated uniform hotel room rate and Rack Rate Structure.

10.      Absent Defendants' anti-competitive and deceptive conduct, Plaintiff and the other Class members would have paid substantially less for each of the rooms purchased during the Class Period based upon free and open competition. The direct consequence of Defendants' unlawful conduct was that Plaintiff and other Class members paid enormous overcharges on their purchases of rooms at hotels throughout the Class Period. Plaintiff thus seeks damages and equitable relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. In addition, a subclass of Massachusetts residents who purchased room reservations also bring claims for violations of the Massachusetts Consumer Protection Statute, M.G.L.C. 93A, Section 9 *et. seq*. and for violations of other applicable consumer protection statutes.

11.      As a direct and proximate result of Defendants' unlawful conspiracy, Plaintiff and the proposed Classes paid artificially-inflated prices for hotel rooms throughout the Class Period and sustained related damages arising from their inability to purchase rooms in a free and open

market based upon lawful competition. Accordingly, Plaintiff and Class members have paid substantial supra-competitive prices and this systematic conduct continues to injure customers.

## PARTIES

### A.    Plaintiff

12.    William Thompson is a resident and citizen of Essex County in the Commonwealth of Massachusetts. During the Class Period, he purchased rooms through Priceline.com at the Marriott Hotel, Philadelphia, PA and Starwood's Le Meredian Hotel in Cambridge, MA. Plaintiff paid artificially inflated prices due to the conspiracy and has been damaged by the conduct alleged herein.

### B.    Defendants

13.    Defendant Booking.com B.V. is a company based in Amsterdam, the Netherlands, with its principal place of business at Herengracht 597, 1017 CE, Amsterdam, Netherlands. It also maintains a U.S. office at 801 Travis Street, Suite 1625, Houston, Texas, It owns and operates Booking.com, the leading worldwide online Room Reservations agency by room nights sold, attracting over 30 million unique visitors each month via the Internet from both leisure and business markets worldwide. Booking.com B.V. is a wholly owned subsidiary of Priceline.com Incorporated.  Booking.com conducts substantial business in the State of Texas. It also conducts business nationwide.

14.    Defendant Booking.com (USA), Inc. is a Delaware corporation with a place of business located at 801 Travis Street, Suite 1625, Houston, Texas. Booking.com (USA), Inc. is a wholly owned subsidiary of Priceline.com Incorporated and also conducts business nationwide.

15.     Defendant Expedia, Inc. is a Delaware corporation with its principal place of business at 333 108th Avenue NE, Bellevue, Washington 98004, and conducts substantial business in the State of Texas and also conducts business nationwide.

16.     Defendant Hotels.com LP is an affiliate of Expedia. Hotels.com LP is a Texas limited partnership with its headquarters located at 10440 North Central Expressway, Suite 400, Dallas, Texas 75231.  All operations are centralized from the Dallas-based corporate office and also conducts business nationwide.

17.     Defendant Orbitz Worldwide, Inc. is a Delaware corporation and its corporate headquarters are located at 500 W. Madison Street, Suite 1000, Chicago, Illinois 60661 and also conducts substantial business in the State of Texas. It also conducts business nationwide.

18.     Defendant Priceline.com Incorporated is a Delaware corporation with its primary place of business located at 800 Connecticut Avenue, Norwalk, Connecticut 06854. It also maintains an office in San Jose in the State of Texas, conducts substantial business in the State of Texas, and also conducts business nationwide.

19.     Defendant Sabre Holding Corporation, incorporated in Delaware, has its worldwide headquarters at 3150 Sabre Drive, Southlake, Texas 76092, from which its operations and this scheme were centralized and also conducts business nationwide.

20.     Defendant Travelocity.com LP is a Delaware limited partnership with its principal place of business and corporate headquarters located at 3150 Sabre Drive, Southlake, Texas 76092. Travelocity is owned by Texas-based Sabre Holding Corporation. Travelocity is a leading provider of consumer-direct travel services and also conducts business nationwide.

21.    Defendant Hilton Worldwide, Inc. is a Delaware company doing business as Hilton Hotels & Resorts with its primary place of business located at 7930 Jones Branch Drive, McLean, Virginia.  It conducts substantial business in the State of Texas and also conducts business nationwide.

22.    Defendant Intercontinental Hotels Group Resources, Inc. is a Delaware corporation with its primary place of business located at 3 Ravinia Drive, Suite 100, Atlanta, Georgia 30346-2149.  It conducts substantial business in the State of Texas and also conducts business nationwide.

23.    Defendant Kimpton Hotel & Restaurant Group, LLC is a Delaware limited liability company with its principal place of business located at 222 Kearny Street, Suite 200, San Francisco, CA 94108.  It conducts substantial business in the State of Texas and also conducts business nationwide.

24.    Defendant Marriott International, Inc. is a Delaware corporation with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817-1102.  It conducts substantial business in the State of Texas and also conducts business nationwide.

25.    Defendant Starwood Hotels & Resorts Worldwide, Inc. is a Maryland corporation with its principal place of business at One StarPoint, Stamford, Connecticut 06902. Starwood's hotels are primarily operated under the brand names St. Regis®, The Luxury Collection®, Sheraton®, Westin®, W®, Le Meridien®, Four Points® by Sheraton, Aloft® and Element®.  It conducts substantial business in the State of Texas and also conducts business nationwide.

26.    Defendant Trump International Hotels Management, LLC, doing business as The Trump Hotel Collection, is a Delaware limited liability company headquartered at 725 Fifth

Avenue, New York, New York 10022.  It conducts substantial business in the State of Texas and also conducts business nationwide.

## UNNAMED CO-CONSPIRATORS

27.     Various other persons, firms and corporations, not named herein as Defendants have participated as co-conspirators with the Defendants in the acts complained of and have performed acts and made statements in furtherance of the conspiracy and unlawful conduct described herein. Some of these firms are unidentified but will be identified through discovery.

28.     In addition, the acts alleged against the Defendants in this Complaint were authorized, committed, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

29.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

30.     Whenever this Complaint refers to an act, deed or transaction of a corporation or entity, the Complaint is alleging that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## JURISDICTION AND VENUE

31.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. §1 and pursuant

to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. Subject matter jurisdiction is

proper pursuant to 15 U.S.C. §15(a), and 28 U.S.C. §§ 1331 and 1337.

32.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28

U.S.C. § 1391(b) and (c), in that one or more of the Defendants reside in this judicial district

and/or are licensed to do business or are doing business in this judicial district, as set forth above

in paragraphs 9 through 24.[1]

33.     Venue is also proper in this District since many of the Defendants reside, transact

business, are found, or have agents in this District. Further, a substantial part of the events or

occurrences giving rise to the claims alleged occurred in the District.

## FACTUAL ALLEGATIONS

34.     During the Class Period, from January 1, 2000 through the present date, the

internet travel industry has seen explosive growth. Estimates indicate that more than one-half of

all hotel bookings in the United States are made online, with most through internet travel

companies owned by the OTC Defendants. During this same period, the defendants have

engaged in rate parity.

35.     In its 2001 SEC filing, Expedia explained the differences between the agency,

merchant, and wholesale models in similar fashion.

> Under the agency model we act as an agent in the transaction, passing a customer's
> reservation to the…hotel…and receiving a commission from the supplier for our services.
> In an agency transaction the supplier determines the retail price that the customer pays

---

[1] While Plaintiff is a Massachusetts resident and venue would be proper in Massachusetts, Plaintiff's counsel recognizes that given the pending MDL action, all future related actions will be consolidated in this Jurisdiction.

and the suppliers act as the merchant of record in the transaction...[u]nder the merchant model we are the merchant in the transaction. Our suppliers make inventory available to us at...net rates. We then determine the retail price that the customer pays and we then process the transactions by buying the inventory and selling it to the customer.

36.     Under the Agency Model, the Rack Rate Structure is used by the Defendants. Instead, under the Agency Model, the Defendant hotels should be setting and the Defendant OTCs should be requiring a competitive price for room reservations to maximize business traffic and to compete against OTCs who should be allowed to offer the same services. These competitive practices have not occurred and have been eliminated by agreement.

37.     At the inception of the class period, on or about 2000, the Defendant OTCs began insisting on the use of the Merchant Model. Under the merchant model, the Defendants OTCs entered into contracts with the Defendant hotels. In their contracts, the parties agreed to a price for hotel rooms and the Defendant OTCs acquired the right to sell occupancy of the rooms to the consuming public. The OTC Defendants are the merchants of record and are paid directly by the consumer. The OTC Defendants agree with the Hotel Defendant for rooms on a net basis. This allows the OTC Defendant to set the room price to the consumer, thereby controlling its profit from the markup. However, all OTC Defendants still utilize the Rack Rate as the minimum price charged to the consumer. Although the hotels and OTCs claim that their negotiated rate is confidential, the contracts between the OTCs and the hotels (with rare exception) contain parity and "most favored nation" clauses.

38.     While there is also a "wholesale model," utilized by smaller price-cutting OTCs which obtain access to rooms through wholesalers, it is to deal late blocks of rooms that need to be filled. Under this wholesale model, the Defendant OTCs utilizing this model should also be competing on price by increasing or decreasing the margin added to the wholesale rates to set the

retail rate to compete on price. However, the process is controlled by the Defendant OTCs who work with the Hotel Defendants to cut-off smaller OTCs from purchasing rooms by the Hotel Defendants.

39.     Through their internet presence and web sites, the OTC Defendants solicit and allow consumers to rent hotel rooms in many different hotels throughout the country and the world. Throughout the class period, these OTC Defendants have offered their services to the Hotel Defendants and consumers through a coordinated uniform structure consisting of the three business models described above.

40.     The OTC Defendants have gained a dominant presence in the online sale of Room Reservations. The OTC Defendants now hold more than a 60 percent market share in the internet travel market. The OTC Defendants have become increasingly important to the Hotel Defendants' business by generating as much as one-half of the Hotel Defendants' room reservation traffic. Accordingly, the Hotel Defendants believe that they need access to the OTC Defendants' distribution network.

41.     As a result of their dominance, and knowing that the Hotel Defendants cannot afford to lose access to their distribution network, the OTC Defendants devised an illegal PMA scheme to prevent new or more efficient internet retailers and other parties from competing and lowering room rates.  They exacted agreements from the Hotel Defendants that desired to sell room reservations through the OTC Defendants which even imposed a penalty of termination as a condition of doing business with other competing Online Travel Companies such that the Defendants were able to ensure that competing OTC Defendants refrained from discounting prices below the Rack Rate.

42.     While the OTC and Hotel Defendants have maintained that their negotiated rates are confidential, in fact the agreements negotiated between each Defendant OTC and Hotel Defendant contain rate parity and most favored nation clauses and the various OTC Defendants actually have the same wholesale or net rate with the Hotel Defendants. More importantly, the OTC Defendants maintain Rate Parity on the rate of the room itself, in order to coordinate the rate with the Defendant hotels.

43.     The PMA Agreements were part of an overall unlawful coordinated conspiracy to impose and enforce the PMA and Rack Rate Structure. For example, in 2004, multiple hotels, including Defendants Hilton and Kimpton, and OTCs including Defendants Priceline, met together in Las Vegas for EyeforTravel's second annual Revenue Management & Pricing in Travel conference. At the conference, Defendants Hilton, Kimpton and Priceline discussed "rate parity" and pricing strategies. Jimmy Shu, VP Revenue Management and Distribution at Kimpton led a presentation to "address the issues associated with adapting rate parity across all distribution channels…" Since that time, there have been annually sponsored conferences, and the attendees have expanded to include most of the Defendants.

44.     Pursuant to the coordinated PMA Agreements, the Hotel Defendants required that any competing OTCs agree to raise and maintain retail prices in accordance with the rack rate structure, or refused to allow OTCs to sell their rooms if the OTCs refused to engage in fixing and raise and maintain resale prices at the Rack Rate.

45.     Each of the Defendants has used the mails, wires and sophisticated automated internet strategies to ensure and enforce the agreement that hotel room rates have the same rate structure across all of their distribution channels.

46.     Throughout the Class Period, Defendants have engaged in and managed internet web sites through the use of various central databases and automated software systems which allowed all vendors Hotel Defendants, and Defendants OTCs to communicate in real time. These automated systems provide the Defendants the ability to monitor and enforce its' anticompetitive practices and to simultaneously update rates, allotments, inventory restrictions, cut-off dates, and blackout dates.  Through the use of these sophisticated software tools, they can set, fix, maintain, and enforce the conspiracy in real-time.

47.     The Hotel Defendants and OTC Defendants have gone to extraordinary lengths to enforce their secret system, whereby rooms are sold for identical prices by different agents and hotels.

48.     The system is policed by the Defendants, who report any competitors selling rooms at below the Rack Rate.  Any attempt to discount is met with fierce sanctions.  An email to a website from a senior executive at Radisson shows how hotels try to enforce the scheme so that all distribution channels offer the same price.

> "Please REMOVE all Radisson Hotel product from your site as you are causing US online rate parity issues.  We offer a best online rate guarantee. . .same room type should be same price across all online distribution."
> wrote Gail Jordan, a sales director at Radisson.

49.     In another email in response to an attempt to discount by a hotel, an executive at Starwood, which runs Le Meridien (a hotel at which Plaintiff Thompason purchased a room through Priceline, the Westin, W and Sheraton hotels said,

> "Should a wholesaler decide to sell the rooms on a room only basis, he has to make sure that the per contract agreed minimum mark-up is guaranteed." 1.

See The Telegraph,

http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/8467755/Hotels-face-inquiry-in-price-fixing-scandal.html (last visited December 4, 2013).

50.     Essential to the enforcement of the Defendants' conspiracy, and as part of the Defendant Retailer-Hotel Agreements, the Hotel Defendants demonstrated their compliance by requiring that competing OTCs agree to raise and maintain retail prices at the Rack Rate. As a further sign of their agreement with the OTC Defendants, in some instances, the Hotel Defendants repeatedly threatened competing Online Travel Companies with legal action and/or refused to allow competing OTCs, such as Skoosh.com, to sell room reservations if the OTC refused to price fix and maintain resale prices at the Rack Rate in compliance with the PMA scheme. Further, pursuant to their agreement with the Defendant OTCs, in some instances, the Hotel Defendants required the wholesalers to stop providing rooms to price-cutting Online Travel Companies, such as Skoosh.com, if they refused to price fix and maintain resale prices at the Rack Rate.

51.     Skoosh, a small OTC, published a letter dated August 31, 2010, from its CEO to an Online Travel Company Defendants and Skoosh's competitor Booking.com, complaining about Booking.com's enforcement of the Defendant PMA Agreements.

52.     Skoosh did not even have a direct contract with hotels but they were allegedly forced by the OTC Defendants and Defendant Hotels to obey rate parity by the defendants going to Skoosh's suppliers and demanding that Skoosh be cut off. When Skoosh refused to obey rate parity, the following occurred:

> Skoosh's New York based wholesale supplier, Allied Tpro cut them off and
> stated in relevant part, "Trust me, I would welcome the additional business but
> cannot risk our contracts with Hilton"

53.     Dorian Harris, Director of Skoosh.com, learned that when he tried to engage in price competition, he was met with disaster.  According to Dorian Harris, when Skoosh began to compete on hotel rates the industry moved against it.  Some of the world's major hotel chains wrote to Skoosh directly demanding that Skoosh either raise its rates to the same as other hotels and its other distribution partners (calling the practice 'rate parity'). They also threatened removal of all hotels entirely from the Skoosh site.

54.     When Skoosh did not comply, the hotel chains went to their wholesale suppliers and pressured them to disconnect their properties from Skoosh.  Skoosh's main U.S. supplier reluctantly complied and Skoosh's account was shutoff. An article dated April 26, 2011 from tnooz.com revealed:

> "The UK's Office of Fair Trading, a government regulatory body which examines
> business practice and its effect on consumers and industry, is currently
> investigating complaints triggered in part by hotel booking firm Skoosh in
> September 2010 over hotel room pricing on travel websites.
>
> "Rate parity" is frowned upon by many as it restricts the ability to differentiate a
> product based on price. Others simply call it "price fixing".
> A series of emails obtained by Tnooz have now shed further light on the issue,
> with some hoteliers confused about where they stand on the law and others
> seemingly just trying to protect their relationship with large online travel agency
> partners.
>
> Here, one Florida-based hotelier acknowledges that "rate parity" is far more
> prevalent in the US than in Europe, when asked to explain why the distributor is
> being told to set a room rate:
> "…if we do not maintain parity with all, we are threatened with poor placement
> on sites and worst case removal of hotel from sales sites. That is the way the
> OTAs operate in [the] USA.

"[Company A] threatens [us] if [Company B] gets lower rates and vice-versa. It is a vicious cycle if we pull out of parity. I think the model in Europe is built to operate more competitively but that is not the model here (much as I wish it was the same in Europe!)."

Another exchange illustrates the issue further, this time between a Spanish hotel and fellow European distributor (starting with a message from the hotelier).

Hotelier:
"Dear partner, we would appreciate information on where to get the sales prices they [you] post as they were incorrect. As you can see, are selling cheaper than our own website for what they are in breach of obligation to price parity."

Distributor:
"Just to understand, do you want everyone to fix the prices and sell your hotel at exactly the same rate?"

Hotelier:
"Yes I do. But in order to get it I would need to know from where are you taking prices in order to request them to fix their prices. Could you help me please?"
The pair then discuss the ongoing OFT investigation, with the distributor warning the hotelier that regulators are investigating such practices. The exchange continues:

Distributor:
"If you choose to break the law that's of course entirely your decision. We will not assist in this matter."

Hotelier:
"My apologize but I dont understand what do you mean by 'breaking the law'. What it is suppose that I have done? It is not me who is breaking the rate parity."

Distributor:
"Price fixing is illegal. 'Rate parity' may well be part of the hotel industry but that doesn't make it legal and, as I have explained, it is now being investigated by the authorities. Many hotel chains have been approached already. I strongly suggest you seek legal advice before proceeding any further but, again, that's entirely your decision."

Hotelier:
"Thanks very much for your help but I am lost. Fix pricing is illegal? I mean, to have rate parity is illegal? It is the first time I listen that."

55.     The fact that Defendant OTCs have threatened to cut off the sale of room reservations for Hotel Defendants that do not enforce the PMA scheme is entirely consistent with the Rate Assured Hotel Program implemented by Texas-based Defendant Sabre (which also owns Texas-based Travelocity). Sabre's Rate Assured Hotel Program requires the Hotel Defendants to enforce the PMA scheme.

56.     In fact, Texas-based Sabre, which owns Travelocity, also runs a division in the State of Texas called "Sabre Hospitality Solutions," which expressly markets and encourages hotels to adopt rate parity throughout the United States, in effect, the PMA scheme. *See, e.g.,* http://www.sabrehospitality.com/blog/2011-10-27/how-hotels-can-leverage-ota-relationships-without-killing-their-pricing–strategy;   http://www.sabrehospitality.com/blog/2011-11-30/three-top-trends-in-hopsitality-marketing-and-distribution-to-consider-when-planning-for-2012.

57.     Thus, pursuant to the Defendant OTC-Hotel Agreements, both the OTC Defendants and the Hotel Defendants are enforcing the PMA scheme against anyone who attempts to lawfully compete on price, including competing OTC's. For example:

a.      As previously indicated, Defendant Hilton required Skoosh's wholesale supplier in the United States, AlliedTPro, to entirely cut off its contract with Skoosh as a result of Skoosh' s discounting and Defendant Hilton's enforcement of the Defendant OTC-Hotel Agreements. AlliedTPro wrote to Skoosh: "Trust me I would welcome the additional business but cannot risk our contracts with Hilton."

b.      Defendant Intercontinental wrote to Skoosh "demanding that Skoosh either raise[] its rates to the same as the hotels and its other distribution partners (a practice known in the industry as 'rate parity') or remove the hotels entirely from our site…"

c.      In 2003, Defendant Marriott announced "a sweeping overhaul of its transient pricing, bringing parity to all Marriott distribution channels -offline and online." During the Class Period, Marriott was among the Hotel Defendants threatening Skoosh.com with legal action and/or the withdrawal of their room reservations if Skoosh.com did not maintain rate parity.

d.      Defendant Trump expressly admitted it was enforcing the OTC-Hotel Agreements, emailing Skoosh that: "if we do not maintain parity with all, we are threatened with poor placement on sites and worst case…removal of hotel from sales sites…Expedia threatens if Travelocity gets lower rate and vice-versa. It is a vicious cycle if we get out of parity."

58.    Defendants' collusive actions were taken directly because of the conspiracy and the pressure the OTC Defendants were placing on Hotel Defendants to protect the OTC Defendants' margins by enforcing the price fixing scheme. The Hotel Defendants enforced the PMA scheme because they feared losing access to the Defendant OTCs internet presence to sell their rooms if they did not.

59.    Blink Booking, a mobile-only hotel booking service, echoed the claims of competing Online Travel Company, saying: "We've long believed that the big online travel agents have been guilty of denying consumers the best prices -and those hotels' hands are tied by price parity agreements. The online travel market may appear to offer plenty of choice and competition, but the reality is that there are lots of different shop windows selling the same rooms at the same prices -with those prices agreed through parity deals between the big groups and the big OTAs [online travel agents]."

60.     Thus, the OTC Defendants sought and received agreements from the Hotel Defendants that they would only sell to OTCs who would not discount the Rack Rate for room reservations, even if and when it reduced the Hotel Defendants' sales and/or profits by slowing sales of the room reservations.

61.     The U.K. Office of Fair Trade (O.F.T.) has recently issued a Statement of Objections against Booking.com (subsidiary of the U.S. company Priceline), Expedia and the Intercontinental Hotel Group (I.H.G.) alleging that these Defendants have infringed on competition based upon the same price fixing allegations in this case but with respect to hotel rooms in the U.K. Expedia has applied for immunity. The Telegraph reported that Expedia admitted that "it has engaged in cartel conduct in breach of the law," and is "providing information on its rivals under a 'leniency deal'" with the British authorities.

62.     From a consumer's perspective, the Defendant Hotels and OTCs are colluding and agreeing to sell rooms at exactly the same price and they are all, in turn, guaranteeing to the consumer that the best price is available on their own sites.  What they are not stating is that the confidence of their guarantee stems from the fact that they have agreed to sell at the same rate and that they have colluded and continue to engage in a massive conspiracy, which includes intimidating any companies openly discounting and withdrawing supply from them.

63.     Based upon information and belief, the Defendants have set up armies of monitors and automated software systems to monitor and enforce the illegal conspiracy.

64.     The Hotel Defendants cannot deny that they agreed to work with the Defendant OTCs to implement and enforce the PMA scheme to ensure that competitive pricing by competing Online Travel Companies or any other parties be restrained and prevented.

65.	The Agreements between and the Hotel Defendants to impose and enforce "rate parity" -*i.e.,* restraint on price competition, benefits the OTCs Defendants' and does not have any legitimate pro-competitive reason.

66.	In the class certification Order in City of <u>San Antonio, et al. v. Hotels.com, et al</u>, 2007 WL 1541184 (W.D. Tex. 2007), the cited deposition testimony delineates virtually identical business practices of the OTC Defendants with respect to their contracts with the Hotel Defendants, their uniform calculations of margins and sell rates.

67.	In <u>City of San Antonio</u>, the Court determined that the margins of each of the OTC Defendants were identical to the other OTC Defendants. It found almost without exception, the net rate and sell rate for a given room on a given day are the same among the OTC Defendants because the agreements with the Hotel Defendants all contain "parity" or "Most Favored Nation" ("MFN") clauses. This also makes the [OTC] margins the same. *Id*. at 20, n21.

68.	Due to the Most Favored Nation clauses utilized by all of the OTC Defendants in their agreements with each Hotel Defendants, Rate Parity is guaranteed. Therefore, anyone accessing any Hotel Defendant website and any OTC Defendant website for the same room, on the same date, at the same hotel will find across-the-board identical minimum rates. The only occasional variation will be a higher rate posted by one of the OTC Defendants.

69.	The PMA Scheme has achieved its illegal goal: Defendant OTC's do not compete on the basis of price for room reservations. Rather, all online sales of room reservations for the same rooms are at the Rack Rate and based upon the fixed and agreed upon Rack Rate Structure.

70.	In fact, in <u>City of San Antonio</u>, the Court recently commented on the similarity of the business models and pricing structures of the OTC Defendants:

> After reviewing the record, it is clear that the Defendants not only engage in a common course of conduct, but that many of their business practices are virtually identical. These practices include but are not limited to the manner in which they contract with the Hotel Defendants, the manner in which they determine and assess cancellation policies and fees, the manner in which they determine the mark up and fees to arrive at an acceptable margin and retail/sell rate; and, the manner in which they calculate, assess and pay hotel occupancy taxes. The deposition testimony of the corporate representatives, standing alone, reflects an amazing similarity in practice, procedure and corporate methodology among all of the [Online Travel Company Defendants].

Memorandum and Opinion on Class Certification, *City of San Antonio v. Hotels.com, et al.,* No. SA-06-CA-381-0G (W.D. Tex) (the "San Antonio Class Cert Order") at 18-19 (emphasis added).

71.     Tim Gordon, Senior Vice President, of Priceline has testified under oath in a deposition to the undisputed fact that each of the Online Travel Company Defendants buys the rooms and sells the rooms to the public at exactly the same price.

72.     The court determined, in the San Antonio action, based upon deposition testimony, that the margins of each of the OTC Defendants were identical to the other OTC Defendants:

> Almost without exception, the net rate and sell rate for a given room on a given day are the same among the [Online Travel Company Defendants] because the Defendants' agreements with the Hotel Defendants all contain "parity" or "Most Favored Nation" clauses.  This also makes the [ITe] margins the same.

*Id*. at 20, n21.

73.     As a result of the "success" of the PMA scheme, the OTC Defendants are confident that all of the prices listed between them for the same room will be identical. Thus, they each offer a near identical "best price" guarantee -knowing it is the only price available even among competitors. Examples confirm this fact.

### Hotels.com "Price Match Guarantee"

"The hotels.com Price Match Guarantee protects your pocket book and takes the worry out of booking a hotel room. After you book with hotels.com, if you find a lower publicly available rate online for the same dates, hotel, and room category, we will match the price and refund you the difference.

And unlike some of our competitors, we will match the price right up to the time of the property's cancellation deadline, whether that is three days after you made the reservation or three months. So stop worrying and start booking."

### Expedia.com "Best Price Guarantee"

We're so confident you'll find the best price for your trip here on Expedia that we guarantee it. Find a cheaper trip within 24 hours of booking and we'll refund the difference-and give you a travel coupon worth $50.

Expedia's Best Price Guarantee covers virtually every part of your trip: flights, hotels, vacation packages, cruises, rental cars, and activities. Here's how to tell if your Expedia reservation qualifies:

- Are travel dates the same?
- Is the hotel, room type and rate plan and cancellation policy the same?
- Is the airline, class, fare and cancellation policy the same?
- Is the car class and cancellation policy the same?
- Is the cruise line, cabin, class, fare, and cancellation policy the same?
- Does each part of your package match?
- Is the other fare from a U.S.-based website and quoted in dollars?

### Travelocity.com "Best Price Guarantee"

"We guarantee the best price. If you find a lower price online, we won't just match it, we'll also give you $50 off your next trip."

### Orbitz.com

" You book a flight or hotel

Book a flight or prepaid hotel room on Orbitz and we immediately start tracking to see if another customer books the same itinerary at a lower price.

**2** They book it for less

If another Orbitz customer books your same itinerary for less, we'll issue credits -- or Orbucks -- for 110% of the difference. Amounts range from $5 to $250 per airline ticket or $5 to $500 per hotel booking.

**3** You get hotel credit, automatically

No need to call, email or fill out forms. We'll deposit Orbucks into your "My Account," which you can redeem about three days after your qualifying trip is complete. "

74.     Absent the PMA scheme, the OTC Defendants could not offer the best price guarantees unless they engaged in price competition and discounted the Rack Rates.

75.     The Defendants' PMA Agreements, and the scheme in restraint of trade, have harmed competition in the relevant market(s) and caused prices to be higher in the relevant market(s) than the prices would have been without the Agreements.

76.     In addition, the uniform adoption and enforcement of "rate parity" and most favored nation clauses by the OTC Defendants is a *per se* horizontal price fixing agreement.

77.     The PMA scheme and Rack Rate Structure were specifically intended to protect the Defendants from price competition -both from Hotel Defendants and other highly efficient retailers -offering the same inventory. Thus, Defendants agreed to restrain competition by mandating higher price levels and thereby preventing the competition or by eliminating the price cutting entirely. This scheme achieved its goals, and thereby substantially inflated prices to consumers like Plaintiff and Class members.

78.     In sum, the Defendants are engaged in an anti-competitive scheme under which the OTC Defendants have utilized their substantial market power and dominance to induce the

Hotel Defendants into agreeing to do one or more of the following: (a) impose minimum resale price maintenance agreements on competing OTCs and all other parties who attempt to compete; (b) enforce the price maintenance agreements as to the OTCs; and/or (c) cut off supply to price-cutting OTCs.

79.    The relevant product market in this case is direct online travel retail sales of room reservations.

80.    The relevant geographic market in this case is the United States and/or the Commonwealth of Massachusetts.

81.    The Defendants have exercised their monopoly power to control prices and exclude competition in the relevant market(s). The OTC Defendants at all times relevant hereto, have possessed monopoly power in the relevant market(s). The OTC Defendants and their subsidiaries hold over a 60 percent market share in the internet travel business market. Moreover the OTC Defendants possess a dominant share of the market(s) for online retail sales of room reservations.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

82.    In formulating and effectuating their conspiracy, Defendants and their co-conspirators have engaged in anticompetitive practices, the purpose and effect of which was and continues to be to set, artificially fix and/or maintain the prices charged to Plaintiff and Class members. The overall effect of Defendants' anti-competitive scheme has been to substantially prevent competition from lower-priced room reservations. Absent the Defendants' exclusionary conduct, barriers to entry to the market would have been lower, which: (a) would have made it easier for existing or new competitors to enter or expand their positions in the market for room

reservations, and (b) would have caused existing or potential competitors to be attracted to the room reservation market because of the supracompetitive prices that the Defendants were charging.

83.     The presence of unfettered competition from actual or potential competitors, which were selling lower-priced room reservations, would have forced the Defendants to lower the prices for their room reservations in order to remain competitive and/or to counter a perceived threat of additional entry.

84.     During the relevant period, Plaintiff and the other members of the Class purchased room reservations directly from the Defendants. As a result of the Defendants' alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the room reservations they purchased. Plaintiff would have been able to, *inter alia,* purchase less-expensive room reservations had potential competitors been able to engage in unfettered competition. The prices that Plaintiff and the other Class members paid for room reservations during the Class Period were substantially greater than the prices that Plaintiff and the Class members would have paid absent the illegal conduct alleged herein because: (1) the prices of all room reservations were artificially inflated by the Defendants' illegal conduct; and (2) Class members were deprived of the opportunity to purchase room reservations from the Defendants or their competitors at substantially lower prices. Thus, Plaintiff and the Class have, as a consequence, sustained substantial damages in the form of substantial overcharges.

## CLASS ALLEGATIONS

85.     Pursuant to Rule 23 of the Federal Rules Of Civil Procedure, Plaintiff brings this class action on behalf of himself  and all members of the following class (the "Class"):

> All persons and entities throughout the United States who, from January 1, 2000 through the present date (the "Class Period"), paid for a room at a Defendant Hotel reserved through the Online Travel Comapny Defendants.  Excluded from the class are persons and entities who purchased a packaged services deal.

86.     Pursuant to Rule 23 of the Federal Rules Of Civil Procedure, Plaintiff brings this class action on behalf of himself  and all members of the following subclass (the "Massachusetts Class"):

> All persons and entities throughout the Commonwealth of Massachusetts who, from January 1, 2000 through the present date (the "Class Period"), paid for a room at a Defendant Hotel reserved through the Online Travel Company.  Excluded from the class are persons and entities who purchased a packaged services deal.

87.     Plaintiff believes that the Class and the Massachusetts Class include thousands of consumers and businesses across the United States, though the exact number and the identities of the Class members are currently unknown.

88.     The members of the Class and the Massachusetts Class are so numerous that joinder of all Class members are impracticable.

89.     Common questions of law and fact exist as to all members of the Class and the Massachusetts Class and predominate over any questions affecting solely individual members of the Class and the Massachusetts Class. Nearly all factual, legal, and statutory relief issues raised in this Complaint are common to each of the members of the Class and the Massachusetts Class and will apply uniformly to every member of the Class and the Massachusetts Class. Among the

questions of law and fact common to the nationwide Class and the Massachusetts Class members are:

    a.    whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to competing and lower-priced room reservations;

    b.    whether Defendants unreasonably restrained trade;

    c.    whether Defendants' anti-competitive contracts, combinations, and conspiracies have caused Plaintiff and the other members of the nationwide Class and the Massachusetts Class to suffer antitrust injury in the nature of overcharges;

    d.    whether Defendants' unlawful conduct caused Plaintiff and other Class and Massachusetts Class members to pay more for the room reservations than they otherwise would have paid;

    e.    the appropriate Class-wide measure of damages;

    f.    whether, and in what amount, Plaintiff and the other nationwide Class and Massachusetts Class members are entitled to recover treble damages, court costs, and attorneys' fees;

    g.    whether Defendants' anti-competitive conduct is continuing, thus entitling the Class and the Massachusetts Class to injunctive relief to promote unrestrained trade and free and fair competition.

    h.    Whether the Defendants' conduct violated the relevant federal antitrust laws;

> i.      whether Defendants undertook actions to conceal their unlawful conspiracy.

> j.      Whether Defendants actions violated Massachusetts laws as set forth herein;

90.     Plaintiff's claims are typical of the claims of other members of the Class and the Massachusetts Class because Plaintiff and every member of the Class and the Massachusetts Class have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interest adverse to the interests of the other members of the Class and the Massachusetts Class.

91.     Plaintiff will fairly and adequately represent and protect the interests of the Class and the Massachusetts Class. Plaintiff has retained able counsel with extensive experience in class action litigation. The interests of Plaintiff are coincident with, and not antagonistic to, the interests of the other Class and Massachusetts Class members.

92.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

93.     Plaintiff and other members of the Class have suffered damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will retain substantial funds received as a result of their wrongdoing, and such unlawful and improper conduct shall, in large measure, go unremedied. Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Defendants

will be allowed to continue such conduct with impunity and retain the proceeds of its ill-gotten gains.  Defendants must disgorge all ill-gotten gains.

94.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Moreover, because the damages suffered by individual members of the Class are relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. The Class is readily definable, and prosecution of this action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS

95.     Plaintiff repeats and realleges each of the foregoing allegations in Paragraphs 1 through 93.

96.     Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until immediately prior to commencing this civil action.

97.     Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

98.     Because of the self-concealing nature of Defendant'' actions and their affirmative· acts of concealment, Plaintiff and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

99.     Defendants continue to engage in the deceptive practices. Class members are injured on a daily basis by Defendants' unlawful conduct. Therefore, Plaintiff and the Class submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class purchased a room reservation constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

100.     Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

101.     Defendants' conduct was and is, by its nature, self-concealing. Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiff and the Class from learning of their illegal, anti-competitive, unfair and/or deceptive acts.

102.     By reason of the foregoing, the claims of Plaintiff and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## COUNT I

### VIOLATION OF 15 U.S.C. § 1
### (AGREEMENTS UNREASONABLY RESTRAINING TRADE AGAINST ALL DEFENDANTS)

103.     Plaintiff hereby incorporates paragraphs 1 through 102 as if fully set forth herein.

104.     The PMA Agreements, and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiff and the Class thereby.

105.    The PMA Agreements cover a sufficiently substantial percentage of relevant market(s) to harm competition.

106.    The Defendants are liable for the creation, maintenance, and enforcement of the PPA Agreements under a per se rule of reason standard.

107.    The Defendants possess market power.

108.    The PMA Agreements harm competition by artificially raising and stabilizing prices.

109.    There is no legitimate, pro-competitive business justification for the PMA Agreements or any of them that outweighs their harmful effect.

110.    Plaintiff and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which resulted in Defendants' substantial exclusion of competition in the relevant markets.

111.    Plaintiff and the other members of the Class have been forced to pay higher prices for room reservations than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT II

### VIOLATIONS OF 15 U.S.C. §1
### (HORIZONTEAL PER SE AGREEMENT-AGAINST OTC DEFENDANTS)

112.    Plaintiff hereby realleges and incorporates paragraphs 1 through 111 as if fully set forth herein.

113.    The OTC Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

114.     The conspiracy consisted of a continuing agreement, understanding and/or concerted action between and among the Defendants to fix, maintain and/or stabilize prices for online Hotel room reservations. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and an unreasonable and unlawful restraint of trade.

115.     As a direct and proximate result of the OTC Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supra-competitive prices for room reservations.

### COUNT III
### (Against the OTC Defendants)
### UNTRUE AND MISLEADING ADVERTISING UNDER M.G.L. c. 266 § 91

116.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs 1 through 115 as if fully set forth herein.

117.     Defendants' labeling, advertising, marketing and promotion of its hotel room reservations is untrue, deceptive and misleading, in violation of M.G.L., c. 266, § 91.

118.     Defendants knew, or could, upon reasonable investigation, have ascertained that their labeling, advertisings, marketing and promotion of hotel room reservations was untrue, deceptive and misleading.

119.     The untrue, deceptive and misleading labeling, advertising, marketing and promotion of hotel room reservations by the OTC Defendants has continued throughout the Class period, and is continuing as of the present date.

120.     As a consumer of the OTC hotel room reservation who was injured by Defendants' false and misleading advertising (in that Plaintiff received a product that did not confirm to the representations made about it by Defendants), Plaintiff is entitled to and does

bring this class action to seek all available remedies under M.G.L. c. 266, § 91, including

injunctive relief. The injunctive relief would include an order directing Defendants to cease their

false and misleading labeling and advertising, retrieve existing false and misleading advertising

and promotional materials, and publish corrective advertising.

## COUNT IV

## UNFAIR AND DECEPTIVE CONDUCT IN VIOLATION OF M.G.L. c. 93a, § 2

121.    Plaintiff hereby realleges and incorporates paragraphs 1 through 120 as if fully set

forth herein.

122.    The conduct of the Defendants, as alleged herein, constitutes unfair or deceptive

acts or practices and unfair methods of competition in trade or commerce in violation of M.G.L.

c. 93A, § 2 and the regulations promulgated thereunder, including without limitation, 9.40

C.M.R. § 3.05(1) and (2).

123.    Defendants' unlawful conduct consists of false and misleading statements,

representations and depictions in its internet advertising as alleged in greater detail herein. Such

conduct caused injury to Plaintiff and each Class member, in that they paid more for the falsely

advertised product they purchased than they would have paid for competing products based upon

open and free competition.

124.    The unfair or deceptive acts or practices of Defendants as alleged herein were

willful or knowing violations of M.G.L. c. 93A, § 2, within the meaning of M.G.L. c. 93A(3).

125.    Plaintiff and the Class have been injured by Defendants' unfair or deceptive acts

or practices and unfair methods of competition.

126.     Pursuant to M.G.L. c. 93A, §§ 9(3) and 9(4), Plaintiff and each member of the Class are entitled to recover double or treble the amount of their actual damages, plus their reasonable attorney's fees and the costs of this action.

127.     Plaintiff and the Class are also entitled to injunctive relief in the form of an order directing Defendants to cease their false and misleading internet advertising, retrieve existing false and misleading advertising and promotional materials, publish corrective advertising and disgorge all profits from their deceptive advertising.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff and the Class request judgment against the Defendants as follows:

a.     For an Order certifying this case as a class action against Defendants and appointing Plaintiff as representative of the Class;

b.     For money damages in favor of Plaintiff in an amount determined by the jury;

c.     For permanent injunctive relief against Defendants to prevent further violations of the law;

d.     For attorneys' fees, costs and interest as allowed by law; and

e.     For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: February 4, 2013

Respectfully submitted,

*/s/ Dean Gresham*
Dean Gresham
PAYNE MITCHELL LAW GROUP, LLP
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
T: 214.252.1888
F: 214.252.1889
dean@paynemitchell.com

*Attorneys for Plaintiff and Proposed Class*